**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Henry J. Wojtunik, | ) |
|     Plaintiff/Judgment Creditor, | ) No. CV-03-2161-PHX-PGR |
|     vs. | ) |
| Joseph P. Kealy, et al., | ) ORDER |
|     Defendants/Judgment Debtors, | ) |
|     and | ) |
| TIG Insurance Company of Michigan, | ) |
|     Garnishee. | ) |

Among the motions pending before the Court are five dispositive motions related to insurance policy coverage issues: TIG's Rule 12(c) Motion for Judgment on the Pleadings (Doc. 229), Plaintiff-Judgment Creditor Henry J. Wojtunik's Motion for Summary Judgment (Doc. 242), TIG's Motion for Summary Judgment Based Upon Defendants' Breach of Cooperation Clause Duties to TIG (Dispositive Motion #1) (Doc. 250), TIG's Motion for Summary Judgment re: "Insured v. Insured" Exclusion (Dispositive Motion #2) (Doc. 251), and TIG's Motion for Summary Judgment re: Fraud Exclusion and Rescissory Damages

(Dispositive Motion #3) (Doc. 252).  Having considered the parties' memoranda, the Court finds that the motions should be granted in part and denied in part.[1]

Background Summary[2]

The remaining portion of this action is a garnishment proceeding through which Henry Wojtunik is attempting to collect on a stipulated judgment, in the principal amount of $8 million, settling his federal and state securities fraud claims brought in this action against former officials of International FiberCom Inc. ("IFC").  The securities fraud claims arose from Wojtunik's sale in February 2001 of his closely-held corporation, Anacom Systems Corporation, to IFC, which was accomplished by merging Wojtunik's company into an IFC subsidiary created for that purpose, International Fibercom-ANA ("IFC-ANA")[3]; Wojtunik was paid through an exchange of his Anacom stock for IFC stock purportedly worth $8 million.  IFC filed for bankruptcy in February 2002, a year after the merger, and its stock became worthless. The gist of Wojtunik's second amended complaint was that the settling defendants, and other IFC officers and directors who were

---

[1] While oral argument has been requested as to some of the motions, the Court concludes that a hearing would not aid the decisional process because the facts and legal contentions are adequately presented in the numerous, and often repetitive, materials submitted to the Court.

The Court notes that it is intentionally discussing herein only those issues and arguments raised by the parties that it believes are minimally necessary to resolve the pending motions.

[2] Since the parties are familiar with the complex facts of this case, the Court references the facts here only as they may be relevant to the Court's disposition of the pending motions.

[3] The subsidiary, International Fibercom-ANA, changed its name to Anacom Systems Corporation on March 8, 2001.  For the sake of simplicity, the subsidiary will always be referred to as IFC-ANA.

dismissed from the action prior to the entry of the stipulated judgment, committed securities fraud during the merger negotiations by artificially inflating the value of IFC's stock through accounting fraud, and by making false and misleading statements to Wojtunik personally and through IFC's financial statements and reports filed with the SEC.  The settling defendants, Joseph Kealy (IFC's CEO), Terry Beiriger (IFC's CFO) and Anthony Baumann (IFC's COO) (the "Insureds"), settled Wojtunik's claims against them in December 2006 through what the parties denominated a Damron agreement; as part of the settlement, the Insureds assigned their claims against their primary insurer and certain excess insurers to Wojtunik in exchange for a covenant not to execute on the stipulated judgment.

The Insureds, as IFC's officers and/or directors, were covered by a $2.5 million primary Directors and Officers ("D&O") insurance policy issued by Carolina Casualty Insurance Co.  Carolina had no responsibility under the D&O policy to defend the Insureds, but did have the responsibility to pay the Insureds' losses stemming from securities claims against them, including their defense costs.  As a result of Carolina's denial of coverage and refusal to advance defense costs, the Insureds (and other former IFC officers and/or directors not a party to this garnishment proceeding) filed a declaratory judgment action in November 2004 in Maricopa County Superior Court against Carolina that alleged several state law claims. That case was removed on the basis of diversity in March 2005 and was assigned to the Honorable Frederick J. Martone as Kealy v. Carolina Casualty Ins. Co., CV 05-0911-PHX-FJM.

Judge Martone entered a summary judgment order in January 2007 wherein he found that the Insureds were in fact covered by Carolina's D&O policy.  Pursuant to the parties' subsequent settlement of the reminder of the

- 3 -

coverage case, which included the issue of the amount of compensatory damages for the breach of contract (including both defense costs and indemnity), and the issues of bad faith and punitive damages, a final judgment was entered into on February 9, 2007 that (1) declared that there was D&O coverage for Wojtunik's securities fraud claims and that Carolina was required to reimburse the Insureds for their fees and costs incurred in defending the securities fraud claims, and (2) dismissed with prejudice all other claims in the complaint. The judgment did not set forth any amount for defense fees and costs.  Wojtunik, Carolina and the Insureds entered into a settlement agreement in April 2008 that, in part, dismissed Carolina's appeal of Judge Martone's judgment and provided that Carolina would pay the limits of its policy.  Carolina exhausted its limits of its $2.5 million primary policy on May 7, 2008 by reimbursing the Insureds for their defense costs incurred in defending the securities fraud action and by paying Wojtunik the remainder of the primary policy limits, some $2,026,641.

The garnishee here, TIG Insurance Co., issued a $2.5 million D&O policy to IFC's officers and directors that was the first layer of excess coverage to Carolina's primary policy.  TIG's policy "followed form" to Carolina's policy, which meant that its coverage was to be applied "in conformance with and subject to the warranties, limitations, conditions, provisions, and other terms" of Carolina's policy.  TIG's policy stated that its coverage would attach only after Carolina actually paid out the limits of its primary policy.

Discussion

I. "Insured v. Insured" Exclusion

Both parties seek summary judgment on the issue of whether the "insured v. insured" exclusion in Carolina's policy bars coverage for the Insureds'

1   settlement agreement with Wojtunik.[4]   The Court concludes that there are no

2   genuine issues of material fact as to this issue and that the "insured v. Insured"

3   exclusion does not bar coverage as a matter of law.

4          Carolina's policy, to which TIG's policy followed form, stated that it would

5   "pay the Loss of each and every Director or Officer of the Company."  "Loss" was

6   defined in relevant part as being "damages, judgments, settlements and Costs of

7   Defense," "Director(s) and Officer(s)" were generally defined as meaning "any

8   past, present or future duly elected or appointed directors or officers of the

9   Company," and the "Company" was defined as "the Parent Organization [IFC]

10  and any Subsidiary."

11         The policy also contained several exclusions from coverage, including the

12  "insured vs. insured" exclusion, set forth in section IV.F of Carolina's policy, which

13  provided in relevant part that:

14         The insurer shall not be liable to make any payment for Loss in connection
       with a Claim made against any Insured:
15     * * *
              F. ... by any of the Directors and Officers; provided, however, this
16     exclusion does not apply to
              1. any Claim by any security holder of the Company,
17     whether directly or derivatively, but only if such Claim is instigated
       and continued totally independent of, and totally without the
18

19     _____
       [4]
20            Given the Court's resolution of this issue on its merits, the Court had no
    need to consider Wojtunik's arguments that TIG's reliance on the "insured v.
21  insured" exclusion is barred by the doctrines of collateral estoppel and *stare
    decisis* due to Judge Martone's resolution of the same issue in the coverage
22  action against Carolina.

23         While the parties have both moved to strike various of the other's
    statements of fact and exhibits, the Court concludes that it need not determine
24  the admissibility of the factual statements and underlying documentation at issue
    as the Court has not relied on them in resolving the pending summary judgment
25  motions.

26

solicitation of, or assistance of, or active participation of, or intervention of, any Insured or the Company.

A. Applicability of the exclusion based on Wojtunik being the president of IFC-ANA

TIG, which as the insurer bears the burden of establishing the applicability of any exclusion from coverage, Hudnell v. Allstate Ins. Co., 945 P.2d 363, 365 (Ariz.App.1997), contends that Wojtunik became the appointed president of IFC-ANA, the IFC subsidiary that was formed as a result of IFC's acquisition of Wojtunik's company, for purposes of the "insured v. insured" exclusion on February 9, 2001 and remained so for some unspecified period of time.  Wojtunik contends that he was never the president of IFC-ANA for purposes of the exclusion because Joseph Kealy was at all times president of IFC-ANA from February 5, 2001 through his resignation on February 13, 2002.

While TIG has submitted some colorable evidence concerning Wojtunik's status as IFC-ANA's president, the Court concludes that TIG's evidence is not significantly probative as it does not create any genuine issue as to any fact that is material as a matter of law for purposes of the "insured v. insured" exclusion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986) ("As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.")

In order for the "insured v. insured" exclusion to be applicable under the facts of this case, Wojtunik must have been "duly elected or appointed" to the

- 6 -

position of IFC-ANA's president by IFC-ANA's board of directors.[5]  "Duly," which is not a defined term in Carolina's policy, is generally interpreted to mean "in a due manner - that is through regular and proper channels of corporate governance."  *See* Sphinx Internat'l, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 412 F.3d 1224, 1228 (11th Cir.2005) (construing a "duly elected or appointed" officer requirement in a D&O policy's "insured v. insured" exclusion). Under Arizona law, the proper procedure for selecting a corporate officer requires a selection in accordance with the corporation's bylaws.  A.R.S. § 10-840(A) ( "A corporation shall have the officers described in its bylaws or appointed by the board of directors in accordance with the bylaws.")  The bylaws of IFC-ANA, adopted on February 5, 2001, provided in relevant part that "[t]he officers of the Corporation shall be elected annually by the Board.  Each such officer shall hold office until his or her successor is duly elected or until his or her earlier death or resignation or removal in the manner hereinafter provided."  The bylaws also provided that "[a]ny officer may be removed, with or without cause, at any time by resolution adopted by a majority of the whole Board," and that "[a]ny officer may resign at any time by giving written notice of his or her resignation to the Board, the Chairman of the Board, the President or the Secretary."

There is no factual dispute that Joseph Kealy, then IFC's CEO, was duly elected president (and chairman of the board) of IFC-ANA on February 5, 2001 in its articles of incorporation.  A resolution of the board of directors on that date

---

[5]

Whether Wojtunik may have acted similarly to a corporate president in terms of the managerial-type duties he performed for IFC-ANA, which the parties dispute, is an issue that the Court deems to be legally irrelevant for purposes of determining whether Wojtunik was ever the "duly elected or appointed" president of IFC-ANA.

stated that the elected officers "shall hold office until their respective successors have been duly elected and qualified."  There is also no factual dispute (1) that the minutes of an IFC-ANA's board of director's meeting held in March 2001, regarding the addition of IFC-ANA as a borrower to an IFC credit agreement with a bank, authorized Joseph Kealy, as IFC-ANA's president, to sign necessary loan documents; (2) that the IFC-ANA's directors issued a  Certification as to the Election, Qualification, Incumbency and Signatures of Certain Officers on June 14, 2001 that noted that Joseph Kealy had been duly elected as IFC-ANA's president and continued to be the "duly elected and qualified" president of IFC-ANA; (3) that the directors issued a resolution on October 31, 2001 confirming that Joseph Kealy was the president of IFC-ANA; (4) that the directors formally elected Anthony Baumann as president of IFC-ANA on February 13, 2002, due to Kealy's resignation as president; and (5) that the directors formally elected Peter Woog as president of IFC-ANA on March 22, 2002, due to Baumann's resignation as president.

TIG's contention that Wojtunik became the president of IFC-ANA on February 9, 2001 is in large part based on Wojtunik's employment agreement with IFC-ANA, dated February 9, 2001, which stated that Wojtunik was to be the president of IFC-ANA from February 9, 2001 through February 9, 2004, with automatic one-year extensions thereafter unless he resigned or was terminated. The employment agreement was one of several documents executed on February 9, 2001 as part of the closing of the merger of Wojtunik's company into IFC-ANA.  Several other merger-related documents relevant to the issue of who was president of IFC-ANA were also executed on February 9, 2001:

(1) a 28-page Agreement and Plan of Merger that provided in Article 9 that

1  "[o]n the Closing Date, the Board of Directors and Officers of the Surviving

2  Corporation [IFC-ANA] shall consist of the current Board of Directors and Officers

3  of the Acquisition Subsidiary [also IFC-ANA ] or such persons as IFC shall

4  select."  At that time, Kealy was the president of IFC-ANA.  It also provided, in

5  Article 11.3, that "[t]his Agreement and its exhibits and schedules constitute the

6  entire contract among the parties hereto with respect to the subject matter

7  thereof[.]"

8          (2) a two-page Articles of Merger of Anacom Systems Corporation into

9  International Fibercom-ANA, Inc. that provided in part that "[t]he Plan of Merger

10  does not contain any amendments to the Articles of Incorporation of the Surviving

11  Corporation [IFC-ANA]."  Those articles of incorporation named Joseph Kealy as

12  IFC-ANA's president.  The document was signed on IFC-ANA's behalf by Joseph

13  Kealy as chairman of the board and president.

14          (3) a two-page Plan of Merger of Anacom Systems Corporation into

15  International Fibercom-ANA, Inc. that provided in part that "[t]he officers and

16  directors of Anacom shall be the officers and directors of the Surviving

17  Corporation [IFC-ANA]."[6]  As TIG's argues, Wojtunik was the president of

18  Anacom prior to the merger and thus under this sentence he would be an officer

19  of IFC-ANA.  The Court rejects TIG's contention that this document supports the

20  application of the "insured v. insured" exclusion because the document also

21  inconsistently provided that "[t]he Articles of Incorporation of [IFC-ANA] shall be

22  the Articles of Incorporation of the Surviving Corporation [IFC-ANA]" and that

23  "[t]he Bylaws of [IFC-ANA] shall be the Bylaws of the Surviving Corporation [IFC-

24  _____

[6]

25          The parties disagree as to whether the reference in this sentence to

26  Anacom was a scrivener's error.

ANA]," both of which named Joseph Kealy as IFC-ANA's president, and this portion of the document is consistent with the Articles of Merger, which provided that this document did not amend IFC-ANA's articles of incorporation. The Plan of Merger was signed on behalf of IFC-ANA by Joseph Kealy in his capacity as IFC-ANA's chairman of the board and president.[7]

(4) a two-page Unanimous Written Consent of the Board of Directors of International Fibercom-ANA, Inc. that approved the acquisition of Anacom and the Agreement and Plan of Merger, and authorized IFC-ANA's officers to "carry into effect the terms, purpose and intent of the Merger Agreement, including the execution and delivery of a Henry Wojtunik employment agreement."  This document, which was an approval of the full Agreement and Plan of Merger, not the two-page summary Plan of Merger that referenced Anacom's officers becoming IFC-ANA's officers, does not contain any direct reference to Wojtunik being employed as president of IFC-ANA.

As did Judge Martone in the Carolina coverage action[8], the Court

---

[7]

The Court agrees with Wojtunik that the summary Plan of Merger could not legally have had the effect of appointing Wojtunik president of IFC-ANA because Kealy, the sole signatory of the document on behalf of IFC-ANA, did not have the authority under IFC-ANA's bylaws to appoint anyone president because the bylaws provided that the officers of the company had to be elected by the board of directors and that the board was authorized to act only through a vote at an annual or special meeting or by unanimous written consent.

[8]

Judge Martone, in deciding in a summary judgment order that the "insured vs. insured" exclusion in Carolina's policy did not apply to bar coverage, concluded:

The designation of Wojtunik as president in the employment agreement is insufficient under the FiberCom-ANA bylaws to render him a "duly elected or appointed" officer.  Instead, the bylaws provide

concludes that the "insured v. insured" exclusion does not bar D&O coverage because the IFC-ANA corporate records and board resolutions of record do not establish that Wojtunik was ever the "duly elected or appointed" president of IFC-ANA; those records instead establish a complete chain of presidential succession from Kealy to Baumann to Woog.[9]  There are no corporate documents of record establishing, as there should be if TIG's position were correct, that Kealy, as of February 9, 2001, had resigned as IFC-ANA's president, which under the bylaws required written notice, or had been removed from that position, which under the bylaws required a resolution adopted by the majority of the board of directors, or that Wojtunik was on February 9, 2001, or at any other time, elected or appointed as the replacement president of IFC-ANA through the regular and proper channels of corporate governance, or that Wojtunik subsequently resigned or was removed as IFC-ANA's president and was formally replaced by Joseph Kealy,

---

that an officer of the company must be "elected annually by the Board."  All actions taken by the board and memorialized in its corporate documents demonstrate the election of Joseph Kealy, not Wojtunik, as president of FiberCom-ANA.  Authorizing the company generally to enter into the employment agreement, without express reference to Wojtunik or his title ... does not supersede the Board's express actions.

Kealy v. Carolina Casualty Ins. Co., 2007 WL 158734, at *2 (D.Ariz. Jan. 16, 2007).

[9]

        In determining that Wojtunik was never the "duly elected or appointed" president of IFC-ANA, the Court has considered only the IFC-ANA-related corporate records submitted by the parties.  Other evidentiary materials submitted by the parties related to this issue, e.g., the IFC-related bankruptcy documents, and the various affidavits, declarations, deposition testimony, etc., were deemed by the Court not to be material to the resolution of the issue.

who the IFC-ANA's corporate records indisputably establish was the president of IFC-ANA as of March 2001.

B. Applicability of the exclusion based on Wojtunik being an employee of IFC-ANA

The second issue related to the "insured v. insured" exclusion is whether, as asserted by TIG, the Employee Securities Coverage Endorsement in Carolina's policy expanded the "insured v. insured" exclusion to preclude coverage whenever any employee of IFC or its subsidiaries brought a securities claim against an insured.[10]

Carolina's policy included coverage for a loss incurred by any insured (generally defined in the policy as any director or officer) arising, in part, from any securities claim.  At issue here is the interpretation of an endorsement to Carolina's policy that expanded the definition of "directors and officers" for purposes of a securities claim; the endorsement stated *in toto*:

Modification to Section III.E
Employee Coverage for Securities Claims

In consideration of the premium paid for this Policy, it is understood and agreed that section III. Definitions E. "Director(s) or Officer(s)" of this Policy is amended by the addition of the following:

III. E:  Solely with respect to the coverage afforded under this Policy for any Securities Claim, Director(s) or Officer(s) also means any past, present, or future employees of [IFC and its subsidiaries].

---

[10]

While this argument was raised by Carolina in Judge Martone's coverage action, he did not rule on its merits because he concluded that Carolina was estopped from raising the issue due to its failure to include it as a reason for denying coverage in the notice of denial of coverage it sent to the Insureds. Although the parties here argue extensively as to whether TIG has also waived this defense or should be estopped from raising it, these are issues the Court concludes need not be decided given its determination that the "employee" defense has no merit.

- 12 -

1    The parties' disagreement concerns the reach of the endorsement's

2    definitional change.[11]  TIG's contention is that the endorsement is a definitional

3    expansion of the term "directors and officers" that applies throughout the policy

4    whenever a claim is a securities claim, including in the "insured v. insured"

5    exclusion.  Wojtunik's contention is that the definitional change only expands the

6    coverage for securities claim lawsuits to include employees and does not change

7    the definition of an insured for purposes of the exclusion.

8    The interpretation of an insurance policy is a question of law properly

9    decided by the Court. Sparks v. Republic Nat'l Life Ins. Co., 647 P.2d 1127, 1132

10   (Ariz.), *cert. denied*, 459 U.S. 1070 (1982).  In construing the meaning of an

11   insurance policy provision, the Court must determine its plain and ordinary

12   meaning using the viewpoint of someone not trained in the law or the insurance

13   business, and may not interpret the provision so as to defeat the insured's

14   reasonable expectation of coverage. Samsel v. Allstate Ins. Co., 59 P.3d 281,

15   284 (Ariz.2002).  Under Arizona law, an endorsement to an insurance policy

16   becomes part of the policy as if originally set forth in the policy and is subject to

17   the plain and unambiguous language of any applicable exclusion. Exchange Ins.

18   Co. v. Mar-Fran Enterprises, Inc., 818 P.2d 172, 173 (Ariz.App.1991).  However,

19   "[p]rovisions in the body of the policy are not to be ... modified by the provisions of

20   an endorsement unless expressly stated therein that such provisions are

21   substituted for those in the body of the policy, or unless the provisions of the

22   policy proper and the endorsement are conflicting." *Id. See also*, Roberts v. State

23

24   [11]

25   There is no dispute that Wojtunik's securities fraud lawsuit against the
     Insureds constituted a securities claim within the meaning of the policy, or that
26   Wojtunik had been an employee of IFC-ANA.

Farm Fire and Casualty Co., 705 P.2d 1335, 1337 (Ariz.1985) (Court noted that

"if an insurer wishes to limit its liability, it must employ language in the policy

which clearly and distinctly communicates to the insured the nature of the

limitation.")

Thus, the language of the "insured v. insured" exclusion limiting it to

instances when the person suing an insured is considered to be a director or

officer is not modified by the endorsement except as "specifically set out in the

endorsement." Mar-Fran Enterprises, 818 P.2d at 173.  The endorsement at

issue, which does not change the policy's basic definition of "insured" (which is

limited to directors and officers), does not mention the "insured v. insured"

exclusion, much less clearly and distinctly state that it applies to the "insured v.

insured" exclusion, and applying the endorsement to grant securities claim

coverage to employees without also adding employees to the exclusion does not

inherently conflict with the wording of the exclusion.  It is clear from reviewing

other endorsements in the Carolina policy that make definitional changes

affecting coverage that Carolina knew how to specifically apply definitional

changes to its exclusions.  For example, in extending coverage to employees for

claims for wrongful employment practices, an endorsement provided that the

definition of "insured" in III.G. (the main definitional policy provision for

"Insured(s)") was amended to mean "any Directors and Officers or Employees"

and that endorsement specifically applied that amendment to the "insured v.

insured" exclusion to exempt claims for wrongful employment acts from the

exclusion.[12]  If Carolina meant the endorsement at issue to apply to the "insured

---

[12]
        The endorsement for "Employment Practices Liability Coverage for Directors,
Officers and Employees", which changed the definition of "insured" to include

v. insured" exclusion, it could have, and should have, used a similar format.

Even if the Court were to determine that the endorsement is ambiguous because the "solely with respect to the coverage afforded under this Policy" language could be reasonably construed to mean that "coverage afforded" means the sum total of coverage provided for a securities claim, i.e. basic coverage as reduced by the exclusion, which is a determination that the Court does not make, the outcome would not change because Arizona adopts the rule that ambiguous terms in an insurance contract are to be strictly construed in favor of the insured and coverage and against the insurer, <u>Roberts v. State Farm Fire and Casualty Co.</u>, 705 P.2d at 1336-37, and that this rule of strict construction applies with even greater force where an ambiguity affects an exclusionary clause. <u>Warfe v. Rocky Mountain Fire & Casualty Co.</u>, 589 P.2d 905, 907 (Ariz.App.1978) ("Exclusions in an insurance contract are strictly construed in favor of coverage and against the insurer."); <u>Mission Ins. Co. v. Nethers</u>, 581 P.2d 250, 253 (Ariz.App.1978) (same).

II.  Fraud Exclusion

TIG, through two dispositive motions, argues that the fraud exclusion in Carolina's policy bars coverage for the stipulated securities fraud judgment entered against the Insureds.  The exclusion at issue, Exclusion IV.B (as amended), provided in relevant part:

> The insurer shall not be liable to make any payment for Loss in connection with a Claim made against any Insured:
> * * *
> B. based upon, arising out of, directly or indirectly resulting

---

employees, provided in part that "Solely for purposes of the coverage provided by this endorsement, section IV. Exclusion F. of this policy [the "insured v. insured" exclusion] is amended by the deletion of IV.F.2. and in its place, the addition of the following: IV.F.2.: any Claim for any Wrongful Employment Act[.]"

from or in consequence of, or in any way involving any ... deliberate fraudulent act; *provided, however, this exclusion shall not apply unless a judgment or other final adjudication adverse to any of the Insureds in such Claim shall establish that such Insureds committed such ... deliberate fraudulent act.* (Emphasis added).

The two interrelated issues arising from this exclusion are whether the stipulated judgment, while undeniably a final judgment for purposes of this garnishment proceeding, is, for purposes of the fraud exclusion, a "final adjudication" that "established" that the Insureds committed deliberate fraudulent acts.  The gist of TIG's contention is that the existence of the stipulated judgment necessarily invokes the fraud exclusion as a matter of law since that judgment was a determination that the Insureds committed securities fraud inasmuch as it resolved the four securities fraud claims in Wojtunik's second amended complaint in his favor, and TIG asserts that those claims are scienter-related claims that can only be successfully pleaded through specific allegations of intent to defraud.[13] Wojtunik's contention is that the stipulated judgment does not establish, either facially or as a matter of law, that the Insureds committed a deliberate fraudulent act for purposes of the fraud exclusion as it did not "adjudicate" any of the securities fraud claims on their merits.  The Court concludes as a matter of law that the fraud exclusion does not bar coverage.

First, the Court interprets the term "final adjudication" in the exclusion as

_____

[13]

Judgment was entered in Wojtunik's favor only on Counts I-IV of his second amended complaint, all of which alleged securities fraud-related claims. Count I alleged a violation of § 10(b) of the Securities Exchange Act and Rule 10b-5, and Count III alleged a violation of A.R.S. § 44-1991 (Arizona's counterpart to § 10(b)).  Count II alleged a violation of § 20(a) of the Exchange Act, and Count IV alleged a violation of A.R.S. § 44-1999 (Arizona's counterpart to § 20(a)), both of which impose joint and several liability on persons who directly or indirectly control a violator of the securities laws.

not applying to a settlement.[14] *See e.g.*, <u>Pendergest-Holt v. Certain Underwriters at Lloyd's of London</u>, 600 F.3d 562, 572 n.11 (5th Cir. 2010) ("For those [deliberate fraud exclusion] forms which require a final adjudication, courts have consistently held that the adjudication must occur in the underlying D&O proceeding (not in coverage litigation) and therefore the exclusion is inapplicable if the claim against the D&O is settled.  [I]f the exclusion does not expressly require an adjudication, the exclusion can apply to settlements.") (quoting from Dan A. Bailey, *D&O Policy Commentary*, 702 PLI/Lit 205, 215 (Feb. 17-18, 2004); *cf.* <u>Alexander Manufacturing, Inc. v. Illinois Union Ins. Co.</u>, 666 F.Supp.2d 1185, 1200 (D.Or.2009) (In a case in which the underlying case was terminated by a Damron-like settlement agreement, the court denied summary judgment to the insurer on the ground that a policy exclusion for fraudulent or dishonest acts did not bar coverage because the policy's requirement of a "judgment or other final adjudication" referred "to a final outcome of a case, not a decision during the course of a case.")  If TIG's intent was to apply the fraud exclusion to settlements, it should have done so using alternative language that put the matter beyond reasonable question. *Cf.* <u>National Union Fire Ins. Co, of Pittsburgh, Pa. v. Continental Illinois Corp.</u>, 666 F.Supp. 1180, 1191 (N.D.Ill.1987) (Court, in concluding that a policy that excluded coverage for insureds who were adjudged liable for willful misconduct did not bar coverage for a collusive settlement, noted that since very few civil lawsuits reach the stage of a full-blown trial insurers could not expect the court "to reshape their contractual provisions to deal with an obvious contingency that could readily have been anticipated: a collusive

---

[14]        Although Carolina could have defined the term "final adjudication" in its policy to give it an expansive interpretation, it left it undefined.

1  settlement.")

2  Second, even if the stipulated settlement was a "final adjudication" for

3  purposes of the exclusion, and the Court concludes otherwise, it did not

4  sufficiently "establish" that the Insureds committed deliberate fraud.  The

5  settlement did not facially establish that the Insureds committed a deliberate

6  fraudulent act as there is no such language therein stating that.  Furthermore, the

7  parties' Settlement Agreement, Assignment, and Covenant Not to Execute (what

8  Wojtunik refers to as the Damron agreement), the document that formed the

9  basis for the stipulated judgment, provided that Arizona law governed the

10  agreement's enforcement and interpretation, and Arizona law recognizes that a

11  "judgment entered by stipulation is called a consent judgment," that in a consent

12  judgment "none of the issues [raised by the pleadings] is actually litigated," and

13  that a consent judgment is conclusive with respect to an issue only "if the parties

14  have entered an agreement manifesting such intention." Chaney Building Co. v.

15  City of Tucson, 716 P.2d 28, 30 (Ariz.1986) (citing to Restatement (Second) of

16  Judgments § 27 comment e); see also, Arizona v. California, 530 U.S. 392, 414,

17  120 S.Ct. 2304, 2319 (2000) (noting that consent judgments ordinarily do not

18  support issue preclusion as they are not intended to preclude further litigation on

19  any of the issues presented, and that they have issue preclusive effect only if it is

20  clear that the parties intended their agreement to do so.)  It is clear that Wojtunik

21  and the Insureds had no such intent as the underlying settlement agreement

22  specifically stated that "[n]either the terms of this Agreement nor any judgment

23  entered against the Insureds in the Wojtunik Lawsuit pursuant to this Agreement

24  are a concession that any Insured believes he committed any wrongful act in

25  connection with the circumstances alleged in the  Wojtunik Lawsuit."

26

TIG, noting that allegations of deliberate fraud were the cornerstone of Wojtunik's securities fraud case, asserts that the issue of deliberate fraud was resolved by the stipulated judgment because the Court determined in part in the securities fraud portion of this action that Wojtunik's federal § 10(b) claim, which required, as a pleading standard, a sufficient allegation that a defendant made false or misleading statements either intentionally or with deliberate recklessness, stated a claim for relief.[15]   The Court is unpersuaded and concludes that the mere existence of the stipulated settlement cannot be deemed to have established as a matter of law that the Insureds committed deliberate securities fraud so as to invoke the fraud exclusion.

Even leaving aside the fact that a finding that Wojtunik stated a claim for securities fraud is not at all the same as establishing the existence of securities fraud, TIG's position is problematic because TIG does not dispute that Wojtunik's three non-§ 10(b) securities fraud claims did not require any proof of scienter amounting to deliberate fraud.[16]   The Court agrees with Wojtunik that the

---

[15]

The second amended complaint generally alleged that the defendants, which included Joseph Kealy and Terry Beiriger, but not Anthony Baumann, violated § 10(b), and its Arizona counterpart, § 44-1991, by participating in IFC's systematic, widespread, and significant overstatement of its revenues through accounting misfeasance and other GAAP violations, which misrepresentations were reflected in IFC's 1999 and 2000 financial statements.  In denying the defendants' motion to dismiss the second amended complaint, the Court concluded that it, taken as whole and viewed in Wojtunik's favor, pleaded particularized facts in sufficient detail to give rise to a strong inference that the Insureds knowingly engaged in fraudulent and deceptive conduct related to IFC's financial condition.

[16]

 In denying the dismissal of the control person counts, the Court noted that while secondary liability as a controlling person under § 20(a) cannot exist without a primary violation, § 20(a) does not require that the alleged controlling

stipulated judgment did not allocate the $8 million in damages among the scienter-based and non-scienter-based claims and that the non-scienter-based claims were sufficient by themselves to support the judgment.  The Court further agrees with Wojtunik that the fraud exclusion, even if otherwise applicable to some of the Insureds, would not prevent coverage for the judgment as it relates to Anthony Baumann, whose liability under the judgment is joint and several, because he was not a named defendant in the § 10(b) claim and therefore his liability was not founded on a claim that required fraudulent intent, and the actions of the Insureds named in the § 10(b) claim cannot be imputed to him because Carolina's policy stated that "[t]he Wrongful Act of a Director or Officer shall not be imputed to any other Director or Officer for the purpose of determining the applicability of Exclusions ... B [the deliberate fraud exclusion][.]"  The Court rejects TIG's contention that the fraud exclusion bars coverage for the stipulated judgment if a single Insured is determined to have committed deliberate fraud because the fraud exclusion does not unambiguously state that, *see* <u>Ranger Ins. Co. v. Phillips</u>, 544 P.2d 250, 256 (Ariz.App.1976) ("For a policy exclusion to be effective, it is necessary that it spell out with precision the conditions which will

---

person be primarily liable under § 10(b), and Arizona law establishes that scienter is not an element of the two Arizona statutory claims. *See* <u>State v. Gunnison</u>, 618 P.2d 604, 607 (Ariz.1980) (holding that "as to civil cases, scienter is not an element of a violation of A.R.S. § 44-1991(A)(2) [making it unlawful with regard to transaction involving the purchase or sale of securities to "make any untrue statement or material fact, or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading."]"; <u>Eastern Vanguard Forex, Ltd. v. Arizona Corporation Comm'n</u>, 79 P.3d 86, 99 (Ariz.App.2003) (finding that control person liability under A.R.S. § 44-1991 does not require that the controlling person must have actually participated in the specific action on which the securities violation is based.)

make it effective."), and TIG has not cited to any Arizona court decision prohibiting insurance coverage for a stipulated judgment that may include both covered and uncovered damages.

III.  Wojtunik's Damages as Uninsurable Loss

Carolina's policy generally defines "Loss" as meaning "damages, judgments, settlements and Costs of Defense" with various exceptions, including an exception for "matters which may be uninsurable under the law pursuant to which this Policy shall be construed."

TIG, through one of its summary judgment motions, argues that there is no insurance coverage because the damages awarded Wojtunik in the stipulated judgment are uninsurable as a matter of law because they constitute rescissory damages.[17]  TIG's basic contention is that since Wojtunik alleged in the securities fraud action that his damages arose from the sale of his company in return for $8 million in IFC stock that ultimately was worthless, and that to be made whole, he sought to recover the $8 million that he was promised, the settlement amount was restitutionary in character because it served to restore to Wojtunik the ill-gotten gains resulting from IFC's securities fraud.  The Court is unpersuaded.

Even assuming that Arizona public policy precludes insurance reimbursement for restitutionary or disgorgement payments made by an insured, an issue that Wojtunik disputes and the Court need not resolve here, the Court

---

[17]

In its response to Wojtunik's summary judgment motion, TIG very cursorily argues that because another exception to the definition of "Loss" provides that it does not include "any amount for which the Insureds are not financially liable," there is no coverage because under the terms of the settlement agreement the Insureds are not financially liable for the stipulated judgment amount.  The Court rejects this contention due to TIG's failure to validate it with any cogent argument supported by any legal authority.

concludes that the stipulated judgment constitutes a loss within the meaning of the policy.  The cases on which TIG relies, such as  Level 3 Communications, Inc. v. Federal Ins. Co., 272 F.3d 908 (7th Cir.2001) and Alanco Technologies, Inc. v. Carolina Casualty Ins. Co., 2006 WL 1371633 (D.Ariz. May 17, 2006)[18], do not control here because the allegations and assorted claims in the securities fraud complaint underlying the stipulated judgment did not necessarily restrict potential recovery to restitutionary or disgorgement-type damages.  While Wojtunik's securities fraud action certainly arose from IFC's failure to compensate Wojtunik for the purchase of his company as required by the parties' contract, it did not seek the return of IFC's ill-gotten gains as any rescissory-type relief would have been futile given that IFC was in Chapter 7 bankruptcy proceedings at the time this action was commenced.  Unlike in Level 3 and Alcano Technologies, the damages sought against the Insureds, which included both compensatory and punitive damages for the harm suffered by Wojtunik, were not rescissory in nature given that the Insureds could not have disgorged any ill-gotten gains because IFC, not the Insureds, received the benefit of Wojtunik's transaction with IFC, and IFC never indemnified the Insureds for the damages at issue in the stipulated judgment.

---

[18]    Both Level 3 and Alcano Technologies involved suits under D&O policies seeking coverage for damages awarded against the insured companies based on allegations that plaintiffs sold assets to the insured companies in exchange for the insured companies' stock that turned out to be worth less than had been promised due to fraudulent representations by the insureds.  In both cases, the courts concluded that the insured companies' losses were uninsurable as a matter of public policy because the damages sought were restitutionary in character as the plaintiffs had sought the restoration of ill-gotten gains received by the insured companies, i.e., the value of the plaintiffs' stock that the insured companies acquired without payment of adequate consideration.

IV.  Cooperation Clause

Both TIG and Wojtunik seek summary judgment on the issue of whether the cooperation clause in Carolina's policy is enforceable. The burden of proof as to this issue falls on TIG. Carpenter v. Superior Court, 422 P.2d 129, 132 (Ariz.1966) ("The insurer has the burden of proving the insured's breach of the non-cooperation clause in order to defend successfully on that ground.")

The cooperation provision at issue, section VI.B of Carolina's policy, provides:

> The Insurer does not, however, under this Policy, assume any duty to defend.  The Insureds shall defend and contest any Claim made against them.  The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Costs of Defense without the prior written consent of the Insurer.  Only those settlements, stipulated judgments and Costs of Defense which have been consented to by the Insurer shall be recoverable as Loss under the terms of this Policy.  The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to full information and all particulars it may request in order to reach a decision as to such consent and shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

TIG contends that there is no coverage for Wojtunik's settlement agreement with the Insureds because the Insureds breached the cooperation clause of Carolina's policy by settling the securities fraud action without TIG's consent.  The gist of TIG's position is that the Insureds had no justification for entering into the settlement agreement, whether it be denominated a Damron agreement or a Morris agreement[19], because it was entered into before TIG ever even owed, much less breached, any duty to the Insureds.  TIG asserts that any duties it owed the insureds did not arise until May 2008, which is when Carolina

---

[19]

Damron v. Sledge, 460 P.2d 997 (1969); United Services Automobile Ass'n v. Morris, 741 P.2d 246 (Ariz.1987).

1  paid out its policy limits, but that the Insureds entered into their settlement

2  agreement with Wojtunik in December 2006.  Wojtunik argues that the Insureds

3  were not bound by the cooperation clause because TIG repeatedly reserved its

4  rights, anticipatorily repudiated its obligations to indemnify and consider

5  settlement offers, and actually breached its duty to give equal consideration to

6  settlement offers.

7       Under Arizona law, while an insured's breach of the cooperation clause

8  ordinarily relieves a prejudiced insurer of liability under the policy, the insured is

9  no longer fully bound by the cooperation clause once an insurer breaches any

10  duty owed to its insured. Arizona Property and Casualty Ins. Guaranty Fund v.

11  Helme, 735 P.2d 451, 458-59 (Ariz.1987).  The rationale of this principle is that

12  any express or anticipatory breach by the insurer of any of its express duties,

13  such as its duty to indemnify, or of any implied duty, such as its duty to treat

14  settlement proposals with equal consideration, deprives an insured of the security

15  that he has purchased because the breach leaves him exposed to personal

16  judgment and damage which may not be covered or may exceed the policy limits.

17  Id. at 459.  Arizona law also recognizes that since a cooperation clause only

18  forbids the non-consensual settling of claims for which the insurer has

19  unconditionally assumed liability, an insured defended under a reservation of

20  rights may enter into a reasonable, non-collusive settlement with the claimant

21  without breaching the cooperation clause in order to protect himself "from the

22  sharp thrust of personal liability." Morris, 741 P.2d at 251-52.

23       While TIG is correct that ordinarily "[u]ntil a primary insurer offers its policy

24  limit, the excess insurer does not have a duty to evaluate a settlement offer, to

25  participate in the defense, or to act at all[,]" Twin City Fire Ins. Co. v. Burke, 63

26

- 24 -

P.3d 282, 287 (Ariz.2003); *accord*, Regal Homes, Inc. v. CNA Insurance, 171 P.3d 610, 618-19 (Ariz.App.2007), the record includes information that at the very least suggests that TIG nevertheless undertook to at least preliminarily decide the coverage issue prior to actually having a duty to do so.  The disputed issue is thus whether it was appropriate for the Insureds to have settled the securities fraud action without TIG's consent at the time they did so on the ground that TIG had previously informed IFC and Wojtunik that it was reserving all of its rights and defenses under its policy and was disclaiming coverage based on the "insured v. insured" exclusion.[20]

As the Arizona Supreme Court has noted, "[w]hether an insured has justifiably contravened the cooperation clause is an intensely factual question. The determination depends first upon a breach of the insurer's duty to defend, and second upon the propriety of the insured's consequent prophylactic

_____

[20] Some of TIG's relevant communications include a letter to IFC dated March 26, 2003, wherein TIG, acknowledging receipt of IFC's formal notice of the filing of Wojtunik's securities fraud action and IFC's request for D&O coverage, stated that it was reserving all of its rights and defenses under its policy pending its receipt of further information, and a letter from TIG's counsel to Wojtunik's counsel dated March 31, 2005, which was sent a week after the Insured's counsel asked TIG whether it was willing to tender its policy limits to settle Wojtunik's claims, wherein it reiterated that TIG had, like Carolina, disclaimed coverage pursuant to the "insured v. insured" exclusion, and stated that

TIG has no obligation to tender any portion of its Policy until such time that Carolina Casualty fully exhausts its policy limits by the actual payment of loss. ...  Until such time as Carolina Casualty tenders the full amount of its policy, TIG will not tender any portion of its Policy, and thereby rejects any and all demands and/or requests for settlement.  In the event that Carolina Casualty tenders its limits as a result of said litigation, TIG, at such time, will review its position regarding available coverage under its Policy.

measures." <u>Holt v. Utica Mutual Ins. Co.</u>, 759 P.2d 623, 630 (Ariz.1988).  The Court agrees, and declines to resolve this issue on summary judgment because it is unclear from the record before it whether TIG's communications regarding the Insureds' claim constituted, or reasonably could have been interpreted by the Insureds to have constituted, an actual or anticipatory breach of its duties, whether present or future, to indemnify the Insureds or to reasonably consider Wojtunik's settlement offer, and whether the Insureds' action in settling was a properly measured response to TIG's communications, particularly in light of the timing of the settlement, *i.e.*, whether the Insureds reasonably needed to act when they did to protect themselves from personal liability given, for example, that the settlement occurred prior to Judge Martone's decision regarding the coverage issues and given TIG's stated willingness to review its position regarding coverage availability once its excess policy took effect upon Carolina's tender of its policy limits.

V.  Reasonableness of the $8 Million Stipulated Judgment

Wojtunik also seeks summary judgment on the issue of whether $8 million constitutes a reasonable settlement amount of his securities fraud action.  It is Wojtunik's burden to establish that the stipulated judgment, which the Court tentatively concludes is more akin to a Morris agreement than a Damron agreement, is free from fraud and collusion and reasonable in amount. <u>Safeway Ins. Co. v. Guerrero</u>, 106 P.3d 1020, 1024 (Ariz.2005).

Because this issue should not be decided until the issue of the enforceability of the cooperation clause is resolved, the Court declines to consider it at this time. *See* <u>Waddell v. Titan Ins. Co.</u>, 88 P.3d 1141, 1145 n.3 (Ariz.App.2004).

1

## VI. Motions in Limine

2       Also pending before the Court are Plaintiff-Judgment Creditor Henry J.

3  Wojtunik's Motion in Limine to Exclude the Report and Testimony of FTI

4  Consulting (Doc. 246) and Motion in Limine by Garnishee TIG Insurance re:

5  Evidence and Testimony of Plaintiff's Expert Witness (Doc. 290).  The Court, as

6  is its usual procedure when a matter must be resolved through a bench trial, will

7  deny the motions in limine without prejudice to the issues therein being

8  appropriately raised as evidentiary objections at trial.

9  ## VII. Wojtunik's Motion to Seal

10       Having reviewed Plaintiff-Judgment Creditor Henry J. Wojtunik's Motion to

11  File Under Seal (Doc. 300), the Court concludes that it complies with the Court's

12  previous order regarding the sealing of documents (Doc. 299), albeit fairly

13  minimally so, and the Court will grant it.[21]  While the Court will permit all

14  documents previously lodged as sealed documents or temporarily sealed by court

15  order to remain sealed from public access, with the exception of docket entry 287

16  for which Wojtunik was removed the confidentiality designation, the Court will

17  require the parties to file redacted versions of partially sealed documents as

18  follows:[22]

19       (1) TIG shall file a copy of the Expert Report of FTI Consulting, Inc. that

20  redacts the last paragraph on page 18 through the last paragraph of page 20;

21       (2) Wojtunik shall file a copy of the Rebuttal Report of Chad Coffman that

22

---

[21]

23       If it deems it appropriate, the Court will review the continued necessity

24  for sealing the documents at issue during the trial portion of this action.

[22]

25       The redacted documents shall clearly show that the redacted

26  information was deleted pursuant to the Court's order.

- 27 -

redacts paragraph 17 on page 9, paragraph 24 on page 12, paragraphs 58 and 59 on pages 30-31, paragraph 62 on pages 32-33, and paragraphs 63-65 on pages 33-34;

(3) Wojtunik shall file a copy of the Second Declaration of Henry J. Wojtunik that redacts paragraph 6(g) on pages 8-9, paragraphs 9(b)-10(f) on pages 10-14, and Exhibits C and D;

(4) TIG shall file a copy of TIG Insurance Company of Michigan's Inc. Response to Motion for Summary Judgment that redacts section 3(b), entitled "Wojtunik's Rescission Damages Total Only $160,000," on pages 28-29; and

(5) TIG shall file a copy of Garnishee TIG's Controverting Separate Statement of Facts to Plaintiff's Statement of Facts in Support of its Motion for Summary Judgment that redacts its Supplemental Facts nos. 19 and 20 on page 45.

Therefore,

IT IS ORDERED that TIG's Rule 12(c) Motion for Judgment on the Pleadings (Doc. 229) is denied.

IT IS FURTHER ORDERED that Plaintiff-Judgment Creditor Henry J. Wojtunik's Motion for Summary Judgment (Doc. 242) is granted to the extent that the Court finds that the "insured v. insured" exclusion does not bar coverage under garnishee TIG Insurance Company of Michigan's policy, and it is denied in all other respects.

IT IS FURTHER ORDERED that TIG's Motion for Summary Judgment Based Upon Defendants' Breach of Cooperation Clause Duties to TIG (Dispositive Motion #1) (Doc. 250) is denied.

IT IS FURTHER ORDERED that TIG's Motion for Summary Judgment re:

"Insured v. Insured" Exclusion (Dispositive Motion #2) (Doc. 251) is denied.

IT IS FURTHER ORDERED that TIG's Motion for Summary Judgment re: Fraud Exclusion and Rescissory Damages (Dispositive Motion #3) (Doc. 252) is denied.

IT IS FURTHER ORDERED that Plaintiff-Judgment Creditor Henry J. Wojtunik's Motion in Limine to Exclude the Report and Testimony of FTI Consulting (Doc. 246) is denied without prejudice.

IT IS FURTHER ORDERED that the Motion in Limine by Garnishee TIG Insurance re: Evidence and Testimony of Plaintiff's Expert Witness (Doc. 290) is denied without prejudice.

IT IS FURTHER ORDERED that Plaintiff-Judgment Creditor's Motion to Amend or Correct his Response in Opposition to Garnishee TIG Insurance Company of Michigan's Motion for Judgment on the Pleadings (Doc. 278) is denied.

IT IS FURTHER ORDERED that the Plaintiff-Judgment Creditor's Motions to Strike TIG's Supplemental Facts and to Exclude Testimony (part of Doc. 305) and TIG Insurance Company of Michigan, Inc.'s Motion to Strike Plaintiff's Supplemental Facts in Support of Reply Brief Filed in Violation of Local Rule 56.1(b) (part of Doc. 317) are both denied.

IT IS FURTHER ORDERED that Plaintiff-Judgment Creditor Henry J. Wojtunik's Motion to File Under Seal (Doc. #300) is granted as follows: (1) the Clerk of the Court shall unseal docket entry 287 in its entirety, (2) all other documents previously lodged as sealed documents or temporarily sealed by court order shall remain sealed from public access, and (3) the parties shall file redacted versions of partially sealed documents as set forth in this Order no later

than May 16, 2011.

IT IS FURTHER ORDERED that the parties, after their counsel have reasonably consulted with each other, shall no later than **May 16, 2011** file a joint report with the Court setting forth the parties' views regarding what further needs to be done to resolve the remainder of this action, the manner in which that resolution should take place, and a proposed schedule for accomplishing that resolution.

DATED this 31st day of March, 2011.

Paul G. Rosenblatt
United States District Judge

- 30 -